UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
LISA LEWIS,

                                    Plaintiff,

              -against -

RASHEL CONSTRUCTION,

                                    Defendant.
-------------------------------------------------------------------------------X

**Case No.: 16-cv-3008**

**VERIFIED COMPLAINT**
*Jury Trial Demanded*

     Plaintiff, LISA LEWIS (hereinafter referred to as "Plaintiff" or "Ms. Lewis"), by and through her attorneys, Nesenoff & Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.   At some time prior to 2014, Defendant Rashel Construction ("Defendant") was awarded a "Section 3" federally funded construction project to build low income housing ("the Project"). Pursuant to Federal Law, Defendant was required to provide preferences in employment, training, and contracting to low-income individuals on the Project ("Section 3 workers"). Plaintiff Lisa Lewis, who was qualified to work as a Section 3 worker, was thrilled to have the opportunity to obtain a high paying job that would allow her to develop valuable skills, and immediately applied for a position with Defendant Rashel working on the Project. Indeed, Plaintiff, at her own expense, obtained the necessary license to work on the Project and approached Defendant's manager about applying for a position on the Project. It was immediately apparent that Defendant was only interested in hiring Ms. Lewis if she was a

1

Section 3 worker because they wanted to obtain the attendant federal tax break afforded to businesses who employed Section 3 workers.  Indeed, Defendant told Plaintiff that she "must be Section 3," and only after Plaintiff confirmed that she was a Section 3 worker did Defendant allow her to apply for a position on the Project.

2.   Thereafter, Plaintiff commenced employment with Defendant in December 2014 as a general construction worker on the Project.  Ms. Lewis was thrilled to have the opportunity to make her neighborhood where she had grown up better while also gaining valuable professional experience.  Upon information and belief, Defendant was required to pair Plaintiff with a more experienced construction worker who would act as Plaintiff's mentor and help train her while working on the Project.  Plaintiff looked forward to training with one of her colleagues and was eager to better herself professionally and personally.  Plaintiff was quickly disillusioned, however, when she quickly realized that Defendant Rashel did not want her-or any other women, and especially any African-American women-working on the Project and that Defendant had only hired her because it was required to under Section 3.

3.   Upon information and belief, Defendant set upon a course of mistreatment and abuse intended to make Plaintiff quit as soon as possible in an effort to skirt the Section 3 requirements that mandated them to hire and train her.  Instead of training her, because she is an African American female, Defendant treated Plaintiff like a pariah and subjected her to daily torment.  It was clear that her male co-workers did not accept her when they immediately (i) referred to Plaintiff as a "***fucking dirty bitch***" and a "***lazy nigger***;" (ii) commented lewdly on her "ass" and "breasts;" (iii) refused to train her on substantive work and instead forced Plaintiff to perform cleaning duties and (iv) regularly threatened her by saying such things to Ms. Lewis as "I am going to "***fuck you up"*** and ***I will kick your ass***."

2

4.   Adding insult to injury, instead of protecting Ms. Lewis from the hostile work environment and/or punishing her harassers, Defendant instead blamed Ms. Lewis for "causing trouble" and told her it was up to her to "make it work" when she reported her co-workers disturbing behavior and failure to train her.  Specifically, in response to Plaintiff's complaints of blatant gender and racial hostility and discrimination, Defendant told Ms. Lewis that the aforementioned comments and cleaning assignments were "not a big deal" and "didn't mean anything," and that she should "just brush it off" and have "tougher skin" if she wanted to keep her job.

5.   This is a civil action brought on behalf of Plaintiff Lisa Lewis against Defendant Rashel Construction, for gender discrimination, race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York City Human Rights Law ("NYCHRL"), and the New York State Human Rights Law ("NYSHRL"), along with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

6.   This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendant.

7.   Venue is proper in this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events which give rise to Plaintiff's claims took place in Queens County, New York which is in the Eastern District of New York.

8.  All conditions precedent to filing the instant action have been fulfilled.  On or about January 6, 2016, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the New York State Division of Human Rights.  On or about March 11, 2016, the EEOC issued Plaintiff a Notice of Right to Sue, which is annexed hereto as **Exhibit A**.  Further, this action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## PARTIES

9.  Plaintiff Lisa Lewis ("Plaintiff" or "Ms. Lewis"), is an African-American, female citizen of the United States whom currently resides in Queens County, New York, and who was formerly employed by the Defendant as a construction worker.  At all times relevant, Plaintiff was an "employee" of Defendant as that term is defined by Title VII, the NYCHRL, and the NYSHRL.

10. Upon information and belief, at all times relevant, Defendant Rashel Construction ("Defendant") was and is an entity duly organized and existing under the laws of the State of New York, with a principal place of business located at 524 McDonald Avenue, Brooklyn, New York. At all times relevant, Defendant was Plaintiff's "employer" as that term is defined by Title VII, the NYCHRL, and the NYSHRL.

## FACTUAL ALLEGATIONS

### Defendant Solicits Section 3 Workers

11. At some point prior to December 2014, Defendant was awarded a "Section 3" federally funded construction project to build low income housing ("the Project").

12. Defendant was required to provide preferences in employment, training, and contracting to low-income individuals on the Project ("Section 3 workers"), pursuant to Section 3 of the Housing & Urban Development Act of 1968 (the "Act").   In exchange for employing the requisite number of Section 3 workers, Defendant was afforded a tax break.

13. The purpose of the Act is to allow low-income workers to gain substantive knowledge and training in a particular skill with the goal of helping such individuals find higher paying jobs. Accordingly, upon information and belief, any Section 3 worker employed on the Project was supposed to be paired with a mentor, who's responsibility it was to train and teach the Section 3 worker the necessary procedures and skills to competently complete the work assigned.

14. In order to recruit Section 3 workers, one of Defendant's managers, Tony (last name unknown) ("Tony"), made appearances at local stores near the Project and announced that Defendant was hiring workers for a construction project. Tony further advised that any interested parties should see him at the Project's location site.

**Plaintiff Applies for a Job as a Section 3 Worker**

15. After hearing about the Project, Plaintiff approached Tony and communicated her interest in applying to work for Defendant.

16. Initially, Tony rejected Plaintiff and instructed her that if she wanted to work on the Project, she had to acquire a special license.

17. Ms. Lewis thereafter acquired the necessary license, at her own expense. Plaintiff thereafter showed Tony her license, and again inquired about working for the Project.

18. At such time, Tony became visibly shocked that Plaintiff was able to obtain the requisite license.  Further, in response to Plaintiff's continued interest in working on the Project, Tony

asked Plaintiff if she was "Section 3" and re-iterated numerous times that she "had to be Section 3."

19. Only after Plaintiff confirmed that she was a Section 3 worker did Tony provide Ms. Lewis with an application to work on the Project.

**Defendant Reluctantly Hires Plaintiff**
**In Order to Receive the Federal Tax Break**

20. It was clear to Plaintiff throughout the application process that Defendant was only interested in hiring her if she was a Section 3 worker. Indeed, throughout the application process, Defendant repeatedly asked Plaintiff if she was "Section 3."

21. Moreover, as part of the application process, Plaintiff was provided tax forms to fill out and submit to Defendant. When Tony provided Plaintiff with such tax forms, Tony strictly told Plaintiff that she "must be Section 3!"

22. Because Ms. Lewis was a Section 3 worker, Defendant hired Plaintiff and Ms. Lewis commenced employment with Defendant on the Project as a general construction worker in December 2014.

23. Upon information and belief, Ms. Lewis' fellow colleagues Sal (last name unknown), Ebony (last name unknown), and Tyrone (last name unknown) were also Section 3 workers.

24. Ms. Lewis' first project with Defendant was the construction of five (5) buildings in the Baisley Park Houses in Jamaica, Queens, New York (the "Location").

25. At the time of Plaintiff's employment, Plaintiff's sister lived in one of the buildings.  In addition, Ms. Lewis had lived with her sister in one of the buildings from the ages of 12 to approximately 30 years old.

26. Ms. Lewis was ecstatic to learn a new set of skills and to work with her fellow colleagues to help build the place she once called home.  Upon information and belief, Defendant was required to pair Plaintiff with a more experienced construction worker who would act as Plaintiff's mentor and help train her while working on the Project.  Plaintiff looked forward to training with one of her colleagues and was eager to better herself professionally and personally, and was looking forward to helping.

27. Despite Plaintiff's obvious enthusiasm to learn and grow, Defendant disregarded the spirit and purpose of the Act and refused to properly train Ms. Lewis because of Defendant's disdain for Plaintiff based upon her race and gender. Indeed, although Defendant properly trained Ms. Lewis' similarly situated, male Section 3 colleagues, Defendant opted instead to treat Ms. Lewis like a pariah and subjected Plaintiff to blatant discrimination and harassment premised upon her race and gender.

**Defendant Immediately Subjects Ms. Lewis**
**To Racial Epithets and Repeatedly Calls Plaintiff the N-word**

28. When Plaintiff commenced employment with Defendant, Tony was her first direct supervisor.  Upon information and belief, Tony is of Indian descent.

29. Tony held a deep rooted animus towards African-American individuals and made his disdain for Plaintiff as an African-American woman inescapably clear.

30. From the start of Ms. Lewis' employment, Plaintiff was subjected to disgusting racial remarks and derogatory comments towards African Americans.

31. Tony repeatedly referred to African Americans as "niggers" and would complain that "these fucking lazy niggers don't even want to do any work. I try to hire them but these niggers

7

always want to play and never work."  Moreover, Tony constantly complained about "fucking lazy niggers" to the crew, including Ms. Lewis.

32. Moreover, Tony openly criticized the father of his girlfriend's child, who upon information and belief, was African American, because, according to Tony, "…that nigger is lazy… he don't want to do anything."

33. Plaintiff repeatedly objected to Tony's comments and asked him why he could not use a different word besides "nigger." She told Tony that she was uncomfortable with his use of such a vulgar word.  Tony refused to stop using the word.

34. Thereafter, Tony continued to use blatantly offensive racial remarks in front of and to Plaintiff despite Ms. Lewis' continued objections.

**Plaintiff Returns to the All-Boys Club**

35. Due to the cold weather, construction was halted from January 2015 through March 2015.  Ms. Lewis and her co-workers returned to work in April 2015.

36. When Plaintiff returned, she was supervised by Frank (last name unknown) ("Supervisor Frank") and Marcello (last name unknown) ("Supervisor Marcello").  Upon information and belief, Supervisor Frank was African-American and Supervisor Marcello was Ecuadorian.

37. When Ms. Lewis returned to the construction site in April 2015, she became an "apprentice" with the asbestos workers working on Building #2 at the Location.  Upon information and belief, the vast majority of the workers on the asbestos crew were male including Plaintiff's new co-worker John (last name unknown) ("John").

38. This was the first time Plaintiff had worked with either Supervisor Frank, John, or Supervisor Marcello.

39. Immediately as Plaintiff began working with the asbestos crew, she was treated as an outsider because of her gender and race.  Indeed, the mostly Ecuadorian and male crewmembers frequently socialized with each other, ate lunch together, and carpooled to and from work together.  Notably, no crewmember ever asked Ms. Lewis to participate in such activities.

40. Moreover, the mostly male crewmembers frequently spoke to one another in Spanish.  Ms. Lewis soon realized that they often spoke in Spanish to one another while looking Plaintiff up and down and clearly laughing at Plaintiff.

**John Refers to Plaintiff by
<u>Racially Offensive Names</u>**

41. Ms. Lewis was immediately assigned clean up duty, upon information and belief, based upon her gender.

42. On one occasion, Supervisor Marcello instructed Plaintiff to clean up pebbles that had fallen onto the construction site.  At such time, Ms. Lewis approached the other crew members, including John, to let them know that she had to clean the area.

43. At such time, John turned towards Ms. Lewis and remarked: "Oh! Sha-nay-nay. She talks!"

44. The whole crew erupted in mean spirited laughter.

45. In response, Ms. Lewis asked John what he meant by his comment to which John tried to excuse his offensive remark as a joke and said: "I'm just playing, Sha-nay-nay; I'm just playing."  John's "Sha-nay-nay" comments continued to entertain the crew as everyone laughed at Ms. Lewis' expense.

46. Ms. Lewis immediately reported John's conduct to Supervisor Frank and asked Supervisor Frank to make John stop calling her a stereotypical name that was meant to be offensive.

47.  John continued to habitually refer to Plaintiff as "Sha-nay-nay."

**Defendant Unjustifiably Threatens Plaintiff's Employment and
Removes Plaintiff from the Construction Site**

48. Ms. Lewis also reported John's behavior to Russel (last name believed to be Hasnat) ("Supervisor Russel"), whose father, upon information and belief, owns Defendant Rashel Construction.

49. Despite her reports, the behavior continued unabashed.

50. Thereafter, in or around the last week of April 2015, Supervisor Frank told Plaintiff that she was no longer needed on the project and would be called back when there was more work to do.  Thereafter, Defendant effectively suspended Plaintiff's employment, indefinitely.

51. Defendant alleged that the Location did not need as many workers to finish construction on one side of the building and so Plaintiff's suspension was justified.  Curiously, however, despite being allegedly overstaffed, Plaintiff was the only crew member told to leave the site.

52. During her suspension, Ms. Lewis frequently visited her sister at the Location.  During one of Plaintiff's visits, Ms. Lewis noticed that the construction crew had completed work on the aforementioned side of the building and had moved onto a new project.  Curiously, Plaintiff had not been called back to work as promised.

53. Ms. Lewis visited the Location and spoke to Supervisor Russel.  Ms. Lewis explained that she was told she would get called back to work when work was available and asked why she

had not been called back.  In response, Supervisor Russel told Plaintiff that Defendant did not need her.

54. Thereafter, Plaintiff approached Supervisor Frank and reminded him that as a Section 3 worker, the construction project was required to employ her.  Supervisor Frank informed Plaintiff that he would speak to Supervisor Russel.

55. A few days later, Supervisor Frank called Ms. Lewis and informed Plaintiff that Supervisor Russel had agreed to allow her back but only on the condition that she never be late to work.  Ms. Lewis was confused by this request because she had never previously been late. Despite her confusion, Plaintiff was eager to go back to work and accepted Defendant's offer to return in May of 2015.

**The Construction Crew Torments Plaintiff**
**<u>As the Only Female Construction Worker</u>**

56. The male employees were not happy about Ms. Lewis' return and they made their disdain for having a female worker more than clear by subjecting Ms. Lewis to constant torment, objectification, horrific sexual harassment, and degrading comments based on her gender.

57. The crew, spearheaded by John, made daily remarks about Ms. Lewis' "ass" and "breasts."  By way of example, John often referred to Ms. Lewis' "big fat ass" and the crewmembers made lewd comments to Plaintiff such as "[y]our ass looks good" and "We like black girls."

58. Further, the crewmembers frequently sarcastically asked Ms. Lewis for her phone number and asked to see her after work hours.  The crew called Ms. Lewis "sexy mama."

59. Ms. Lewis objected to such comments but to no avail.  Indeed, Ms. Lewis' objections only seemed to spur the crewmembers on more, as they continued to make such derogatory comments despite Plaintiff's obvious discomfort and disapproval.

60. On one particularly egregious occasion, a crewmember brought a piece of Victoria's Secret lingerie to the Location and Ms. Lewis' co-workers took turns holding it against themselves and frolicked around the construction site mocking women's behavior.

61. Ms. Lewis immediately told her co-workers that such behavior made her uncomfortable and asked them to stop.  As had happened previously, Ms. Lewis' pleas went unanswered. In response, Ms. Lewis attempted to take a picture of the men wearing the lingerie in order to document their behavior.  Upon seeing this, the crewmembers stopped and in unison began to curse and yell at Ms. Lewis for trying to document their discriminatory and hostile behavior.

62. Despite not being able to photograph such conduct, Ms. Lewis reported the incident to Supervisor Frank who again acted as if Plaintiff were the problem.

**Defendant Increases the Discrimination Against Ms. Lewis and**
**Threatens Plaintiff's Physical Safety**

63. Upon information and belief, the crewmembers were notified that Plaintiff had reported them because they became increasingly hostile towards Ms. Lewis.

64. Specifically, the crewmembers frequently harassed and cursed out Plaintiff while at the Location, and increasingly used derogatory names to refer to Ms. Lewis during work hours.

65. Indeed, the crewmembers, especially John, often yelled at Ms. Lewis: "Fuck you, you black bitch. Fuck you, you monkey" and "Fuck you, you nigger."

66. In addition, the crewmembers referred to Ms. Lewis as the "fucking nigger" or the "black bitch" and called Ms. Lewis a "coon" and a "monkey" on a regular basis.

67. When Ms. Lewis vehemently stood up for herself and told John to stop using such derogatory language, John's conduct only worsened and soon Plaintiff faced direct threats to her physical safety.

68. In response, John told Plaintiff: "I'm going to kick your ass, bitch. I'm going to fuck you up." John further threatened to attack Ms. Lewis through third parties and specifically warned that he would "bring girls from Brooklyn to fuck you (Plaintiff) up."

69. At the same time, Supervisor Marcello started to directly lash out at Ms. Lewis and often criticized Plaintiff's job performance without reason. For example, Supervisor Marcello repeatedly accused Plaintiff of having a "bad attitude" and would often send Ms. Lewis home at the start of the day without cause or reason to do so.

70. As a result, Ms. Lewis heavily limited her interactions with Supervisor Marcello and chose not to engage with him during the workday. Nonetheless, Supervisor Marcello would yell at Plaintiff and viciously proclaim: "[d]o you hear me?! You have an attitude problem!"

71. Ms. Lewis again complained to Defendant that she was being singled out and abused because she was African American and a female, and told Defendant that she believed the crewmembers were racist and hated her because she was a woman. As had happened before, however, Defendant ignored Plaintiff's complaints and permitted Plaintiff's colleagues and supervisors to torment her on a daily basis.

**Defendant Refuses to Train Ms. Lewis and**
**Pigeonholes Plaintiff into Stereotypical Gender Roles**

72. Upon information and belief, Defendant was required to pair all Section 3 workers with a more experienced mentor on the Project, in order to train and teach the Project's Section 3 workers the skills necessary to perform the tasks assigned to them.

13

73. Although Defendant did train Sal (last name unknown) and Tyrone (last name unknown), two male Section 3 workers on the Project, Defendant adamantly refused to train Ms. Lewis.

74. Instead, when Plaintiff began as an apprentice for the asbestos crew, she was immediately relegated to performing clean up duty because, upon information and belief, of her gender.

75. Despite this, Ms. Lewis consistently tried to observe her fellow crew members and learn more about the work the asbestos crew performed so that she could learn a new craft and take on more responsibilities.

76. Defendant openly disregarded Ms. Lewis' desire to learn and grow in her profession and refused to properly train Plaintiff.  John, the only employee on the crew available to train Ms. Lewis, refused to train her or even work with her, and instead regularly told her in a nasty and intimidating tone to "get out of the way" when she tried to observe and learn from him on site.

77. John regularly referred to Plaintiff as "the crazy Black bitch" and demanded that Supervisor Frank keep her away from the scaffolding work.

78. Plaintiff continually complained about her lack of training and made numerous requests to be paired with a mentor but to no avail.

79. Defendant disregarded Plaintiff's complaints and continued to assign Ms. Lewis to clean up duties because of her gender.

80. As a result, Plaintiff, and *only* Plaintiff, was consistently assigned to clean the locker room and the yard area (construction site) even though cleaning duties were supposed to be shared between all crewmembers.

81. Adding insult to injury, upon information and belief, Plaintiff's male crewmembers deliberately dirtied the locker room and yard as much as possible in order to make Plaintiff's job more strenuous.

14

**Plaintiff's Work Environment**
**Continues to Rapidly Deteriorate**

82. Despite Plaintiff's continued complaints and objections to the discriminatory and hostile environment, John's behavior continued to escalate and become more and more abrasive and disrespectful.

83. Indeed, John openly called Ms. Lewis a "whore" during the work day and regularly stated, "Suck my dick, bitch" whenever he saw her on the construction site.

84. In addition, John continued to yell "Fuck you, you bitch" to Plaintiff. John even went so far as to insult Plaintiff's mother, telling Ms. Lewis that her mother was a "Black bitch."

85. On one particularly notable occasion, Plaintiff ran into John on a stairwell in one of the buildings at the Location.  Ms. Lewis politely asked John to step to the side and allow her to pass.

86. In response, John again lashed out at Plaintiff, turned around, and said: "[f]uck you, you bitch. You dirty bitch" and told Plaintiff to "[g]et the fuck out of here."

87. Moreover, workers from other construction crews at the Location contributed to Plaintiff's torment.  For example, a worker named Keon (last name unknown) ("Keon"), worked as one of Defendant's scaffold builders and similarly harassed and threatened Ms. Lewis. Indeed, Keon would tell Plaintiff "fuck you, bitch" and threatened to "kick [Plaintiff's] ass."

**Defendant Orders Plaintiff to Stop**
**Complaining About Discrimination**

88. Throughout her tenure with Defendant, Ms. Lewis repeatedly and vehemently complained about the rampant gender discrimination and racism she faced every day from her colleagues and supervisors alike.

15

89. In response, Defendant chose to dismiss Plaintiff's complaints and utterly failed to intervene to alleviate Ms. Lewis' dire situation.   Indeed, Supervisor Marcello was visibly annoyed by Ms. Lewis' complaints and on one occasion told her, "Just don't talk to me! I don't want to hear it!" and walked away.

90. Even more appalling, Defendant regularly criticized Ms. Lewis for complaining to them and instructed her that she should just accept the behavior and stay quiet if she wanted to keep her job.

91. In or around June 2015, Plaintiff once again complained to Supervisor Frank about the constant string of derogatory comments and names John and the male crewmembers directed at her.

92. In response, Supervisor Frank, who, upon information and belief, is also African American, pulled Ms. Lewis aside and advised that she should simply toughen up.   Specifically, Supervisor Frank advised: "Look Lisa, I've been in this business for 18 years, I started working with Italians.   They used to call me spook, coon, nigger.   But I had to eat.   I learned to ignore them and just focus on my career.   I'm now a supervisor.   Did I get here without them trying to break me down?   No.   It happened to me, too.   But I dealt with it, and I didn't let it bother me and I moved along."

93. Supervisor Russel advised Plaintiff that she should stop complaining because she was making money.   Specifically, after Plaintiff complained about the aforementioned stairway incident with John, Supervisor Russel advised her: "Have you ever made this kind of money before?   I know you've never made this kind of money before.   Let John say what he wants to say."

94. Because Supervisor Russell and Supervisor Frank refused to help Plaintiff, Ms. Lewis reached out to the next ranking manager, Raymond (last name unknown) ("Manager Raymond"). Manager Raymond was Supervisor Frank and Supervisor Marcello's superior.

95. In response, Manager Raymond similarly justified the crewmembers' behavior and appallingly tried to make Plaintiff understand that such behavior was normal and acceptable. Indeed, Manager Raymond told Ms. Lewis that the male employees were "not used to women who stand up for themselves.  They're not used to strong women.  Their women are passive [and] do what they're told."

96. When Plaintiff continued to complain about the discriminatory behavior, Manager Raymond replied that she "need[ed] to have tougher skin [and] try to deal with this better." Manager Raymond further told Plaintiff that she "need[ed] to brush it off [because] what John is saying doesn't mean anything."

**Ms. Lewis is Transferred to the Bricklayer Crew and**
**Subjected to More Sexual Harassment**

97. In or around July 2015, Ms. Lewis was transferred from the asbestos crew to the bricklayer crew under the supervision of Pavez (last name unknown) ("Supervisor Pavez"). Initially, Ms. Lewis was hopeful that a transfer away from the asbestos crew would help abate the rampant discrimination and torment she had faced for the past several months.

98. Much to Ms. Lewis' dismay, however, Plaintiff continued to be a target for her all male co-workers.  Indeed, Plaintiff found herself the object of her male co-worker's sexual pursuits.

99. Specifically, Ms. Lewis' male co-worker repeatedly called Plaintiff "baby" and greeted Ms. Lewis each day with "good morning, baby."  Even though Plaintiff repeatedly told her co-worker not to refer to her as "baby," the name persisted.

100.     In addition, Ms. Lewis' new male co-worker frequently asked Ms. Lewis for her phone number, flirted with Plaintiff, and asked Plaintiff to go on a date with him multiple times. Each time, Ms. Lewis adamantly refused to give her colleague her phone number and turned down his advances and requests for a date.

101.     In or around the end of July 2015, Supervisor Pavez approached Ms. Lewis and informed her that construction was winding down and she was not needed as much. Accordingly, Supervisor Pavez began to call Ms. Lewis prior to the start of the workday and told her not to report to work because, allegedly, there was not enough work to do.

102.     Despite Defendant's assertions, however, Plaintiff often observed the bricklayer crew working at the Location after she was told such services were not needed. When Plaintiff asked Supervisor Pavez about his blatant misrepresentations, Supervisor Pavez would dismiss Ms. Lewis.

**Defendant Terminates Plaintiff's Employment and**
**Threatens Plaintiff's Family if She Seeks Legal Assistance**

103.     By the end of the summer, Defendant had arbitrarily and unjustifiably cut Ms. Lewis' working hours to approximately 2-3 days per week. This placed an incredible financial burden on Ms. Lewis as she was paid hourly and therefore not compensated for the days and hours she was not working at the Location.

104.     On or about September 5, 2015, Ms. Lewis visited the Location to speak with one of her old colleagues, Sal. Plaintiff did not enter the Location or construction site but rather stayed on the outside area of the surrounding fence.

18

105.     While there, John noticed Plaintiff and immediately lashed out at her without provocation.  Indeed, as soon as John saw Ms. Lewis, he screamed at Plaintiff: "You fucking dirty bitch. Fuck you and your fucking mother, you dirty bitch."

106.     Ms. Lewis yelled back at John in defense, and immediately left the Location.

107.     Thereafter, upon information and belief, John falsely reported to Manager Raymond that Ms. Lewis had threatened him and that he feared for his life.  Upon information and belief, Defendant called the police and tried to coax Ms. Lewis to return to the Location to scare and confront her with a police presence.  Ms. Lewis informed Defendant that she did not feel safe returning to the Location and rejected Defendant's request to return and "work it out."

108.     Approximately one week later, as Ms. Lewis was walking by the Location to visit a friend, she noticed that her fellow crewmembers were working even though she had not been notified to come in.

109.     Ms. Lewis approached Manager Raymond and Supervisor Pavez and asked if there was any work for her to do.  In response, Manager Raymond and Supervisor Pavez immediately terminated Plaintiff's employment and stated Defendant "[did not] need your (Plaintiff's) services any longer."

110.     Following her termination, Ms. Lewis learned harrowing information about Defendant's continued vendetta against her.  Indeed, upon information and belief, Manager Raymond contacted Ms. Lewis' friend and asked about Plaintiff's sister.  When Ms. Lewis learned of this, she immediately became suspicious.

111.     Thereafter, while Ms. Lewis was visiting her aforementioned friend, Manager Raymond again called Ms. Lewis' friend and spoke to her on the telephone.  Plaintiff was present and heard the conversation.

19

112.     During the conversation, Manager Raymond blatantly threatened Ms. Lewis' sister's livelihood and told Plaintiff's friend (and unknowingly Plaintiff) that Defendant was going to get Ms. Lewis' sister evicted from the Location if Plaintiff pursued any legal action against Defendant.

**CLAIMS FOR RELIEF**
**AS AND FOR THE FIRST CAUSE OF ACTION**
*(Gender Discrimination – Disparate Treatment in Violation of Title VII, the NYCHRL, and the NYSHRL)*

113.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

114.     Plaintiff is a female and is therefore a member of a protected class under Title VII, the NYCHRL and the NYSHRL.

115.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

116.     As set forth in detail above and herein, Defendants subjected Plaintiff to discrimination on the basis of her gender and a hostile work environment on the basis of her gender.

117.     The discrimination Plaintiff suffered while employed at the Location was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

118.     The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment.

119.     By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

120.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her

ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

121.    Accordingly, Plaintiff was discriminated against on the basis of her gender by virtue of having been treated less well than her similarly situated colleagues outside her protected class and having been subjected to a hostile work environment by Defendant based on her gender, in violation of Title VII, the NYCHRL and the NYSHRL.

## AS AND FOR THE SECOND CAUSE OF ACTION
*(Gender Discrimination – Hostile Work Environment in Violation of Title VII, the NYCHRL, and the NYSHRL)*

122.    Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

123.    Plaintiff is a female and is therefore a member of a protected class under Title VII, the NYCHRL and the NYSHRL.

124.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

125.    As set forth in detail above and herein, Defendant subjected Plaintiff to discrimination on the basis of her gender and a hostile work environment on the basis of her gender.

126.    The discrimination Plaintiff suffered while employed at the Location was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

127.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment.

128.     By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

129.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

130.     Accordingly, Plaintiff was discriminated against on the basis of her gender by virtue of having been treated less well than her similarly situated colleagues outside her protected class and having been subjected to a hostile work environment by Defendant based on her gender, in violation of Title VII, the NYCHRL and the NYSHRL.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Gender Discrimination – Sexual Harassment in Violation of Title VII, the NYCHRL, and the NYSHRL)*

131.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

132.     Plaintiff is a female and is therefore a member of a protected class under Title VII, the NYSHRL and the NYCHRL.

133.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

134.     As set forth in detail above and herein, Defendant subjected Plaintiff to sexual harassment and discrimination on the basis of her gender.

22

135.     The sexual harassment consisted of, among other things, inappropriate remarks to Plaintiff of a sexual or otherwise romantic nature, and unwanted advances of a sexual or otherwise romantic nature.

136.     The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment.

137.     By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

138.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

139.     Accordingly, Plaintiff was discriminated against on the basis of her gender and subjected to sexual harassment discrimination by Defendant based on her gender, in violation of Title VII, the NYCHRL and the NYSHRL.

### AS AND FOR THE FOURTH CAUSE OF ACTION
*(Race Discrimination – Disparate Treatment in Violation of Title VII, the NYCHRL, and the NYSHRL)*

140.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

141.     Plaintiff is an African American female and is therefore a member of a protected class under Title VII, the NYCHRL and the NYSHRL.

142.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held with Defendant.

23

143.     As set forth in detail above and herein, Defendant subjected Plaintiff to a hostile work environment, disparate discipline, and disparate treatment on the basis of her race.

144.     The discrimination Plaintiff suffered while employed at Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

145.     The discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment.

146.     By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

147.     As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

148.     Accordingly, Plaintiff was discriminated against on the basis of her race by virtue of having been treated less well than her similarly situated colleagues outside her protected class and having been subjected to a hostile work environment by Defendant based on her race, in violation of Title VII, the NYCHRL and the NYSHRL.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Race Discrimination – Hostile Work Environment in Violation of Title VII, the NYCHRL, and the NYSHRL)*

149.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

150.     Plaintiff is an African American female and is therefore a member of a protected class under Title VII, the NYCHRL and the NYSHRL.

151.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held with Defendant.

152.    As set forth in detail above and herein, Defendant subjected Plaintiff to a hostile work environment, disparate discipline, and disparate treatment on the basis of her race.

153.    The discrimination Plaintiff suffered while employed at Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

154.    The discrimination that Plaintiff suffered while employed at Defendant severely affected the terms and conditions of her employment.

155.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

156.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

157.    Accordingly, Plaintiff was discriminated against on the basis of her race by virtue of having been treated less well than her similarly situated colleagues outside her protected class and having been subjected to a hostile work environment by Defendant based on her race, in violation of Title VII, the NYCHRL and the NYSHRL.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)      On the First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000;

(ii)     On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000;

(iii)    On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages, including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000;

(iv)    On the Fourth Cause of Action, awarding Plaintiff compensatory damages and other damages, including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000;

(v)     On the Fifth Cause of Action, awarding Plaintiff compensatory damages and other damages, including punitive damages in an amount to be determined at trial but in any case no less than $1,500,000; and

(vi)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

**Further,** Plaintiff demands a trial by jury.

**Dated: New York, New York**
         **June 9, 2016**

                            **NESENOFF & MILTENBERG, LLP.**
                            *Attorneys for Plaintiff*


                    **By:**  s/Megan Goddard
                            **Megan S. Goddard, Esq.**
                            **Gabrielle M. Vinci, Esq.**
                            **363 Seventh Avenue, 5th Floor**
                            **New York, New York 10001**
                            **(212) 736-4500**

## **VERIFICATION**

| | |
|---|---|
| **STATE OF NEW YORK** | ) |
| | ) ss.: |
| **COUNTY OF NEW YORK** | ) |

     **LISA LEWIS,** being duly sworn, deposes and says:

     I am the Plaintiff named in this matter. I have read the annexed Verified Complaint against Rashel Construction, know the contents thereof, and the same are true to my knowledge, except as to matters alleged upon information and belief and as to those matters, I believe them to be true.

                            **LISA LEWIS**

Sworn to and subscribed before me
this 31ˢᵗ day of _May_, 2016.

_____
**NOTARY PUBLIC**

OMAR F. MCKENZIE
Notary Public, State of New York
Reg. No. 01MC6337492
Qualified in New York County
Commission Expires February 29, 2020